316 So.2d 681

**LANGAN CONSTRUCTION CO., INC.,
a corp.**

v.

**DAUPHIN ISLAND MARINA, INC.,
et al., etc.**

**SC 1060.**

Supreme Court of Alabama.

July 17, 1975.

Collins, Galloway & Smith, Mobile, for appellant.

J. George Whitfield, Jr., Mobile, for appellees.

SHORES, Justice.

The trial court granted defendant's (hereinafter referred to as marina) motion for summary judgment based upon the pleadings, affidavits, and depositions. The plaintiff appeals.

The complaint, as last amended, contains four counts. Each, in various language, charges the marina with negligence in failing to protect and safeguard the plaintiff's boat, which was docked at the marina, after the marina became aware of the boat's perilous condition and allowed it to sink. Three of the counts allege merely that the plaintiff docked its boat at the marina, paid the usual charge therefor, and that the marina negligently failed to take steps to save the boat after it knew that the boat was taking on water. The last count alleges that the marina had, on prior occasions, undertaken to provide services other

than simply providing space for docking another boat belonging to the plaintiff; that such services included pumping a boat owned by the plaintiff and moored at the marina when it sat low in the water; and that the marina negligently failed to attempt to save the boat which is involved in this lawsuit.

The following facts are clear from a reading of the various affidavits and depositions offered in support of, and in opposition to, the marina's motion for summary judgment:

Plaintiff owned a boat which it kept at the marina before it acquired the Nauti-Lady. That boat, the Miss Misty, took on water from time to time while it was docked at the marina and, on some occasions, employees of the marina would put pumps aboard the Miss Misty and inform the plaintiff that it was taking on water and was in danger of sinking.

The Marina, through Mr. Taul, its owner, on deposition, said that he did not recall whether a charge was made for these services, but it is customary at the marina to charge boat owners by the hour when such services are performed.

There was no written slip rental agreement. It was the testimony of Mr. Taul that the arrangement between the marina and the plaintiff was purely a rental arrangement. The marina charges a flat rate based upon the length of the boat and exercises no control whatever over the boats moored there. The boat owners, including the plaintiff, take the boats in and out without notifying the marina. The plaintiff, on the other hand, says:

". . . It was my understanding that this was a service performed by the Marina to anyone who had a boat berthed at the Marina and that the Marina personnel would do whatever was necessary to safeguard the vessel so long as they were aware of the vessel's condition.

". . .

". . . It was my understanding that the same treatment would be given to the 'Nauti-Lady' as had been given to the 'Miss Misty' if any occasions for safeguarding or protection should arise. . . ." (Affidavit of Thomas J. Langan, President of Langan Construction Company, Inc., plaintiff.)

Before reaching the question of the propriety of granting the marina's motion for summary judgment, it seems appropriate to delineate the legal issues as we view them.

■ We agree with the marina that the cases dealing with the liability of marina operators fall into two categories. Where the marina leases a berth or stall for wet storage of a pleasure boat for a dockage fee and the owner retains control over the vessel, a relationship of lessor-lessee is established between the marina and owner, and the marina owes no duty to the owner-lessee. *Richardson v. Port Vincent Boat Works, Inc.*, 284 F.Supp. 353 (ED La.1968); *Florida Small Business Corporation v. Miami Shipyards Corporation*, (Fla.App.1965), 175 So.2d 46; *Security National Insurance Company v. Sequoyah Marina, Inc.*, 246 F.2d 830 (10th Cir. 1957).

■ The second category of cases involves situations where the vessel is delivered to the marina for repairs or some other purpose, and the damage occurs while in the care, custody, and control of the marina before it is redelivered to the owner. Under such circumstances a bailor-bailee relationship is created and the bailee is charged with the duty of ordinary care and is liable for any damage resulting from his negligence. *Stegemann v. Miami Beach Boat Slips, Inc.*, 213 F.2d 561 (5th Cir. 1954); *Niagra Fire Insurance Company v. Dog River Boat Service, Inc.*, 187 F.Supp. 528 (SD Ala.1960); Annotation "Liability of Operator of Marina or Boatyard for Loss of or Injury to Pleasure Boat Left For Storage or Repair," 44 A.L.R.3d 1332.

The plaintiff argues that this case falls somewhere in between these two catego-

ries. It is the plaintiff's contention that there was at least an implied agreement on the part of the marina to perform salvage operations for boats docked at the marina once it became aware of any danger to the boats. The marina denies this.

We are not impressed with the plaintiff's argument that the marina owed a duty to attempt to salvage the Nauti-Lady because it had attempted in the past to save the Miss Misty. We cannot agree with the theory advanced by the plaintiff that, having undertaken to perform such services in the past without a request to do so, the marina was under a continuing obligation to perform such services.

Plaintiff contends that *Noonan Construction Company v. Federal Barge Lines, Inc.*, 453 F.2d 637 (5th Cir. 1972), supports its argument on this point. In that case, Federal maintained a "fleeting" operation on the East Bank of Mobile River. Its facility was open to the public for storage of barges for six dollars per day. An additional charge was made for services rendered by Federal other than storage. It employed several watchmen, who were responsible for checking every barge hourly from 5 p.m. until 8 a.m. and to punch a time clock positioned on each barge at such times. It was the duty of the Federal watchmen to see that each barge was secure throughout the night. One of the barges sank during the night and its loss was not discovered until the next morning. The court concluded that Federal was liable to the owner, but said:

> "We have previously recognized that a 'fleeter' is a kind of a limited bailee and that his liabilities depend exclusively on the obligations which he has himself undertaken in his contract with the owners of vessels entrusted to his care. . . .
>
> " . . .
>
> "We hold that when a fleeter voluntarily *assumes a duty to provide watchmen for the care and safekeeping* of barges which are entrusted with him, he

is bound to perform that obligation with due care. . . . " (Emphasis Supplied) (453 F.2d at 640, 641)

In *Noonan*, it was clear that Federal, by contract, agreed to keep watch over barges entrusted to its care and to see that such barges were secure while in Federal's custody. It is equally clear that Federal had assumed that duty. In the instant case, it is not clear that the marina had agreed or otherwise undertaken to perform such services. The plaintiff contends through its president that it was his understanding that the marina performed salvage services for boats moored there.

Plaintiff also argues that its position is supported by such cases as *Standifer v. Pate*, 291 Ala. 434, 282 So.2d 261 (1973), and *Beasley v. McDonald Engineering Company*, 287 Ala. 189, 249 So.2d 844 (1971). These cases do stand for the proposition "that a volunteer is under a duty, once he has acted or assumed the duty, to execute the tasks undertaken with reasonable care," *Standifer, supra*; but this rule falls short of holding that, because one has voluntarily undertaken a task in the past, he is therefore under a duty to repeat such tasks in similar situations in the future. The duty, if any, of the marina here must be found in the agreement between the parties. Did it include, as the plaintiff contends, an implied agreement by the marina to "do what it could to safeguard the vessel" once made aware of the danger to it? It is not disputed that the marina did, on occasion, undertake to rescue the Miss Misty. However, it denies that such service was performed pursuant to the rental agreement. In *Richardson v. Port Vincent Boat Works, Inc., supra*, the court said:

> " . . . While Mr. Greer did, on occasions, perform services for boat owners, these services were performed on a contract basis and were never performed pursuant to the slip rental agreement. The defendant was not in any way in charge of plaintiff's boat, either legally or otherwise. It simply rented

docking space to the plaintiff. [Citation Omitted] The monthly rental paid to defendant by plaintiff merely paid for the privilege of mooring his boat in the space provided. [Citation Omitted] The rental arrangement in this case created only the relationship between defendant and plaintiff of lessor-lessee, and did not create a bailment situation. Thus the obligation to use reasonable care imposed by law upon a bailee is not involved. . . ." (284 F.Supp. at 356)

The marina contends it had exactly the same arrangement with the plaintiff in the instant case. The plaintiff contends that the rental agreement carried with it more than merely rental of the boat slip. Mr. Langan says that "he thought" the arrangement also carried with it the obligation to safeguard the boats once they were imperiled and that fact was known to the marina.

The case is here to determine whether the trial court erred in granting the defendant marina's motion for summary judgment based upon the pleadings, affidavits, and depositions. In that posture, the court, in considering the motion for summary judgment, is required to construe the complaint, depositions, etc. most favorably to the plaintiff. *Snyder v. Hillegeist*, 100 U.S.App.D.C. 368, 246 F.2d 649 (1957).

■ The plaintiff has given its version of the arrangement between it and the marina. The marina has given its version. They are in conflict. Granted, it is but a "scintilla" of conflict, but even so, it has been held that if a scintilla of controversy of fact exists, the matter cannot be disposed of through summary judgment. *Reagan v. Commonwealth Theatres of Puerto Rico, Inc.*, 300 F.Supp. 676 (D.C.Puerto Rico 1969).

*Gulf Power Company v. Local Unions Nos. 676 and 1078*, 229 F.2d 655 (5th Cir. 1956), involved the propriety of granting a motion for summary judgment. In that case, the Unions sued the Power Company, the employer, claiming that, for some ten years previously, the Power Company had furnished free transportation to the employees; and that it represented throughout that such free transportation was a part of the compensation and pay of the employees and had, therefore, become an express or implied condition of the written collective bargaining agreement between the Unions and the employer. The Power Company denied that any contract existed to furnish transportation and that it had undertaken, as a temporary measure, to provide transportation; but under the express declaration that it would be discontinued as soon as it appeared that private transportation was available to the employees.

At that stage the trial court granted the Power Company's motion for summary judgment and the Unions appealed to the Court of Appeals for the Fifth Circuit. In reversing, Judge Brown said:

"We are of the clear opinion that, in this posture, this case was not ripe for summary judgment. From the face of the pleadings and the broad contentions permissible under them, it is plain that at least two disputed issues emerged: (1) the extent, nature and terms of the understanding, undertaking or agreement, if any, concerning the furnishing of the transportation; . . ." (229 F.2d at 657)

■ Here, too, we think it was too early to grant a motion for summary judgment. The extent, nature, and terms of the understanding, undertaking, or agreement, *if any*, concerning the undertaking of rescue operations for imperiled boats moored at the Dauphin Island Marina has not been determined.

The plaintiff might not be able to convince a jury that there was an implied agreement on the part of the marina to furnish these services. And even if it does, the jury might well agree with wit-

nesses who, along with the marina, stated that nothing could have been done to save the Nauti-Lady with the equipment available. However, it is entitled to try. For, "A surmise, no matter how reasonable, that a party 'is unlikely to prevail upon a trial, is not a sufficient basis for refusing him his day in court . . .'" *Union Transfer Company v. Riss & Company*, 218 F.2d 553, 554 (8th Cir. 1955).

Reversed and remanded.

HEFLIN, C. J., and MERRILL, MADDOX and JONES, JJ., concur.