ROYAL INSURANCE COMPANY *vs.* MARINA INDUSTRIES,
INC., & others.[1]

No. 91-P-1025.

Norfolk. December 10, 1992. - April 22, 1993.

Present: DREBEN. SMITH. & GREENBERG. JJ.

*Insurance*, Subrogation. *Admiralty. Bailment*, Dockage of vessel. *Negligence*, Bailee. *Vessel*, Dockage.

In an action against the owners of a marina to recover damages for the loss of a vessel docked at the marina, the defendants were entitled to the entry of summary judgment, where the record did not show that the dockage arrangement was a bailment which would, due to the failure to return the vessel, make out a prima facie case of negligence against the marina owners and where, since both the vessel owner and the marina operators had equal unrestricted access to the vessel, there was no basis for applying a presumption or other inference of negligence. [350-352]

CIVIL ACTION commenced in the Superior Court Department on February 12, 1990.

The case was heard by *Roger J. Donahue*, J., on motions for summary judgment.

*Robert J. Murphy, Jr.*, for the defendants.
*Edmund R. Pitts* for the plaintiff.

DREBEN, J. On August 28, 1988, Anthony Campisi docked his boat as a "transient" customer at the defendants' marina in Quincy. Two days later his boat was missing. After he recovered $35,000 as damages from his insurer for the loss of his boat, this subrogation action followed. The insurer is seeking damages for negligence and breach of contract claiming that the dockage arrangement was a bailment and that the failure of the bailee to return the bailed boat made out a prima facie case of negligence against the bailee. See

---

[1]William S. O'Connell and Forge Development Corp.

*Goudy & Stevens, Inc.* v. *Cable Marine, Inc.*, 924 F.2d 16, 18-19 (1st Cir. 1991). On cross motions for summary judgment, a judge of the Superior Court allowed the plaintiff's motion "for reasons stated in the plaintiff's memorandum which is made part of this decision." We reverse the ensuing judgment and order the entry of summary judgment for the defendants.

"Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity." *Sisson* v. *Ruby*, 497 U.S. 358, 367 (1990). The contract for the docking of a pleasure boat on navigable waters "is substantially related to 'traditional maritime activity,'" *ibid.*, and is, accordingly, an arrangement governed by maritime, that is, Federal, law. See generally 1 Benedict on Admiralty § 112 (7th ed. 1988 & Supp. 1989).

Unlike the cases relied on by the plaintiff where a boat was left with a marina for repairs or drydock storage, cases in which a bailment is often found,[2] when docking space only is provided, the relationship is usually held to be that of lessor and lessee. See *Security Natl. Ins. Co.* v. *Sequoyah Marina, Inc.*, 246 F.2d 830, 833 (10th Cir. 1957); *Richardson* v. *Port Vincent Boat Works, Inc.*, 284 F. Supp. 353, 356 (E.D. La. 1968); *Continental Ins. Co.* v. *Washeon Corp.*, 524 F. Supp. 34, 37 (E.D. Mo. 1981); *Langan Constr. Co.* v. *Dauphin Island Marina, Inc.*, 316 So. 2d 681, 682-683 (Ala. 1975); *Blank* v. *Marine Basin Co.*, 178 A.D. 666, 667 (N.Y. 1917); *Marine Basin Co.* v. *Northwestern F. & M. Ins. Co.*, 256 N.Y. 306 (1931); *Foremost Ins. Co.* v. *Blue Streak Enterprises, Inc.*, 353 So. 2d 430 (La. App. Ct. 1977). Compare

---

[2]See, e.g., *Stegemann* v. *Miami Beach Boat Slips, Inc.*, 213 F.2d 561, 564 (5th Cir. 1954); *Goudy & Stevens, Inc.* v. *Cable Marine, Inc.*, 924 F.2d at 18; *Fireman's Fund Am. Ins. Co.* v. *Capt. Fowler's Marina, Inc.*, 343 F. Supp. 347, 349 (D. Mass. 1971); *Selame Assoc., Inc.* v. *Holiday Inns, Inc.*, 451 F. Supp. 412, 419 (D. Mass. 1978); *Marine Office of Am. Corp.* v. *Marine Corp.*, 1981 Am. Mar. Cas. 768, 771 (D. Mass. 1980); *Grabbert* v. *Marina Parks, Inc.*, 101 R.I. 164, 167 (1966). Cf. *Fireman's Fund Am. Ins. Co.* v. *Boston Harbor Marina, Inc.*, 406 F.2d 917 (1st Cir. 1969).

*Pope* v. *Andrews*, 361 So. 2d 71 (Miss. 1978) (marina's employee indicated that he would take care of boat).

This distinction accords with traditional bailment principles, namely that a bailment arises only upon delivery of the property sought to be bailed, "and at least some degree of control over that property, to the putative bailee." See *Sewall* v. *Fitz-Inn Auto Parks, Inc.*, 3 Mass. App. Ct. 380, 382 (1975); *Commodore Leasing, Inc.* v. *Metropolitan Dist. Commn.*, 16 Mass. App. Ct. 266, 267 (1983). The Federal admiralty rule seems somewhat stricter.[3] "It has been stated that an admiralty bailment does not arise unless the delivery to the bailee is complete and he has exclusive right to possession of the bailed property, even as against the owner. *Continental Ins. Co.* v. *Washeon Corp.*, 524 F. Supp. 34, 37 (E.D. Mo. 1981)." *T.N.T. Marine Serv., Inc.* v. *Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 588 (5th Cir.), cert. denied, 464 U.S. 847 (1983). See *Florida Small Bus. Corp.* v. *Miami Shipyards Corp.*, 175 So. 2d 46 (Fla. Dist. Ct. App. 1965).

In any event, even under Massachusetts law, we think a bailment was not established. When Campisi docked his boat at the slip indicated by a marina employee, he was given a four digit code number which gave him land access through a gate to the pier. There was no control over the water exits from the marina to the harbor, the marina did not have keys to the boat, and Campisi and anyone to whom he gave the four digit code could take the boat out into the harbor at any time without permission and without notifying anyone. See *Blank* v. *Marine Basin Co.*, 178 A.D. at 667; *Sewall* v. *Fitz-Inn Auto Parks, Inc.*, 3 Mass. App. Ct. at 383-384. Although the marina had the right to move the boat to another slip in emergency situations, this ability was not sufficient to create a bailment in view of the degree of control maintained

---

[3]The *Sewall* court, at 383, acknowledged that some Massachusetts cases "have extended the concept of bailments for hire well beyond the point to which most (if not all) decisions of other jurisdictions have been prepared to go."

by Campisi.[4] See *T.N.T. Marine Serv., Inc.* v. *Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d at 588; *Florida Small Bus. Corp.* v. *Miami Shipyards Corp., supra.*

There is also no basis in the record for an inference of negligence on the part of the marina in providing transient dockage facilities. The plaintiff makes no specific claim of negligence and appears to rest its case on the presumption of negligence where a bailment is involved. As indicated earlier, we reject that conclusion. Since both parties had equal unrestricted access to the vessel, there was no basis for applying the presumption or other inference of negligence. See *Goudy & Stevens, Inc.* v. *Cable Marine, Inc.*, 924 F.2d at 19-20; *Richardson* v. *Port Vincent Boat Works, Inc.*, 284 F. Supp. at 356; *Milo* v. *Biegler*, 86 A.D.2d 503-504 (N.Y. 1982).

The plaintiff does not complain of the defendants' security arrangements and even argues in its brief that the "defendants' heavy security program indicated that their contract with Campisi [was] a bailment." Moreover, an affidavit from a marine safety consultant in support of the defendants' motion stated that the degree of security for transient dockage provided by the defendants was consistent with the custom and practice of marinas providing transient dockage facilities. See *Blank* v. *Marine Basin Co.*, 178 A.D. at 668. There is thus a complete failure of claim, let alone proof, concerning essential elements of the plaintiff's case, see *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711 (1991), namely, the breach by the defendants of any duty of care or any suggestion that, if such breach occurred, it was the cause of the loss. See *Goudy & Stevens, Inc.* v. *Cable Marine, Inc.*, 924 F.2d at 20-21.

---

[4]To show control by the defendants, Campisi's affidavit stated that the marina had the right to move the boat in other situations. The affidavit also set forth the marina's requirements that boat owners had to get permission to have repairs performed on their boats and could not use the dock for storage of equipment. The conditions as to repairs were explained by the former dock master as due to insurance requirements. We consider that neither the marina's regulations nor Campisi's affidavit indicate sufficient control over the boat by the marina to establish a bailment.

The parties in their briefs have discussed the effect of the transient dockage agreement signed by Campisi which, on its reverse side, purported to incorporate all the terms and conditions of the marina's standard summer dockage agreement. The latter contained an exculpatory clause, the validity of which the plaintiff challenges. See *Bisso* v. *Inland Waterways Corp.*, 349 U.S. 85, 90 (1955); *Fireman's Fund Am. Ins. Co.* v. *Boston Harbor Marina, Inc.*, 406 F.2d 917, 919-921 (1st Cir. 1969). Contrast *Arcwel Marine Inc.* v. *Southwest Marine, Inc.*, 816 F.2d 468, 471 (9th Cir. 1987), cert. denied, 484 U.S. 1008 (1988). In view of our conclusion that there was here no basis for an inference of negligence, we need not reach the effect or application of the exculpatory clause.

The judgment is reversed. Judgment is to be entered for the defendants.

*So ordered.*